UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

DIANA L. TERRY, *Personal Representative*            )
*of the Estate of Jack J. McMillen,*                 )
                                                     )
        Plaintiff,                                )
                                                     )
    vs.                                          ) CASE NO. 1:10-cv-00607-DML-JMS
                                                     )
THE HEALTH AND HOSPITAL                              )
CORPORATION OF MARION COUNTY and                     )
AMERICAN SENIOR COMMUNITIES, LLC,                    )
                                                     )
        Defendants.                               )

# Order on Defendants' Motion for Summary Judgment

## Introduction

       This matter is before the court on a motion for summary judgment (Dkt. 64) filed by defendants The Health and Hospital Corporation of Marion County ("HHC") and American Senior Communities, LLC. ("ASC"). Plaintiff Diana L. Terry is the personal representative of the estate of her father, Jack J. McMillen, who died November 20, 2009. Ms. Terry alleges that her father's death and the suffering he endured before it were the result of poor care and treatment he received at Edgewater Woods nursing facility. Defendant HHC is a municipal corporation and holds the license, issued by the Indiana State Department of Health, to operate Edgewater Woods. HHC contracted with defendant ASC to manage the facility.

       Ms. Terry's amended complaint (Dkt. 44) asserts claims under 42 U.S.C. § 1983, based on the defendants' alleged violation of certain federal nursing home standards under the Federal Nursing Home Reform Act ("FNHRA"). Ms. Terry also seeks relief under Indiana state law.

The defendants' motion for summary judgment on Ms. Terry's federal claims requires the court to decide whether FHNRA creates rights enforceable under section 1983 and, if it does, whether there is sufficient evidence of an "official municipal custom or policy" to support the defendants' liability under *Monell v. Department of Social Services,* 436 U.S. 658, 691 (1978). As to the state law claims, the defendants ask the court to either (a) relinquish supplemental jurisdiction if the court decides Ms. Terry does not have a viable section 1983 claim or (b) dismiss the claims because they are subject to Indiana's Medical Malpractice Act, Ind. Code art. 34-18, and must first proceed before the Indiana Department of Insurance and a medical review panel.

## Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion and identifying the evidence that it believes demonstrates the absence of a genuine dispute as to a material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The nonmovant may not rest on her pleadings, but must "make a sufficient showing on [each] essential element of her case with respect to which she has the burden of proof," *id.* at 323, by designating "specific facts showing that there is a genuine issue for trial." *Id.* at 324. Disputes about irrelevant facts do not matter; only factual disputes that might affect the outcome of the suit in light of the substantive law will prevent summary

judgment. *Liberty Lobby,* 477 U.S. at 248, *JPM, Inc. v. John Deere Indus. Equip. Co.,* 94 F.3d 270, 273 (7th Cir. 1996).

# **Undisputed Facts**

The facts recited below are either undisputed by the parties or presented in the light most favorable to Ms. Terry, the nonmoving party.

**HHC and its relationship with ASC**

HHC is a municipal corporation created under Ind. Code § 16-22-8-6. It holds a license issued by the Indiana Department of Health to operate Edgewater Woods, a 125-bed "skilled nursing facility" in Anderson, Indiana. ASC is an Indiana limited liability company. Both HHC and ASC are "qualified healthcare providers," as defined under Indiana's Medical Malpractice Act, Ind. Code § 34-18-2-24.5.

On January 1, 2005, HHC and ASC entered into an Amended and Restated Management Agreement, under which ASC agreed to manage certain health care facilities, including Edgewater Woods. The Agreement underwent several later amendments. Ms. Terry relies on this agreement and its amendments (Dkt. 75-1, together, the "Management Agreement") as the "official policy or custom" for purposes of section 1983 liability against both HHC and ASC. ASC has adopted certain policies and procedures designed to assure that the facilities it manages comply with applicable state and federal statutes and regulations, which include the policies submitted to the court as Exhibits 1 through 6 to the Affidavit of Dan Benson. (Dkt. 66-1).

**Mr. McMillen's admission and care at Edgewater Woods**

Jack McMillen became a resident of Edgewater Woods on August 17, 2009. He had just been hospitalized because of acute deep vein thrombosis of his left leg and acute and chronic renal failure, and he was admitted to Edgewater Woods for rehabilitation. Mr. McMillen was a

Medicare, but not Medicaid, beneficiary.  On September 26, 2009, Mr. McMillen fell while in his room at Edgewater and suffered an abrasion to his forehead.  After he fell again in his room on October 14, 2009, Edgewater added to its care plan for him an "intervention" for avoiding any more falls.  On October 19, 2009, Mr. McMillen fell again—a third time—in his room.

Mr. McMillen's medical chart noted on November 3, 2009, new pressure sores, including a Stage I sore on his left heel, a Stage I sore on his right outer foot, a skin tear on his right knee, and a scabbed area on each of the right and left knees.

**Mr. McMillen's transfer to Community Hospital and his death**

On November 6, 2009, Mr. McMillen was transferred from Edgewater to Community Hospital Anderson.  There, he was diagnosed with, among other things, "sepsis due to infected cutaneous ulcer on the right knee."  Mr. McMillen died on November 20, 2009.  The recorded cause of death was sepsis as a result of a right knee infection and Methicillin-resistant Staphylococcus aureus.

## Analysis

The court will first address the defendants' argument that Ms. Terry's federal claims fail as a matter of law.  As noted above, two questions are pertinent to that issue.  The court must first decide whether—assuming the truth of the facts alleged by Ms. Terry regarding her father's care and treatment at Edgewater Woods[1]—FNHRA creates the kind of rights, the deprivation of which supports a claim under 42 U.S.C. § 1983.  If the answer is yes, the court will then decide if sufficient evidence supports municipal liability to require resolution by a jury.  The court will lastly address Ms. Terry's state law claims.

---

[1] The defendants accept the plaintiff's factual allegations as true solely for purposes of their summary judgment motion.

# I.   The FNHRA provisions do not create rights enforceable under section 1983.

Counts I and II of Ms. Terry's amended complaint assert claims under 42 U.S.C. § 1983 for damages associated with Mr. McMillen's death and the suffering he endured in the weeks or months preceding his death. Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Section 1983 does not create substantive rights, but rather provides "a means for vindicating federal rights conferred elsewhere." *Padula v. Leimbach,* 656 F.3d 595, 600 (7th Cir. 2011) (internal quotation omitted). The plaintiff must show that she was "deprived of a right secured by the Constitution or federal law, by a person acting under color of law." *Id.* A municipal corporation, like HHC, can be liable as a person under section 1983, but only where "action pursuant to official municipal policy" caused the rights violation and injury; there is no respondeat superior liability. *Monell v. Department of Social Servs.,* 436 U.S. 658, 691-92 (1978); *Palka v. City of Chicago,* 662 F.3d 428, 434 (7th Cir. 2011) (quoting *Wragg v. Village of Thornton,* 604 F.3d 464, 467 (7th Cir. 2010)) (plaintiff must show that his injury was caused by "'the enforcement of an express policy'" of the city, "'a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law,'" or "'by a person with final policymaking authority'").[2]

---

[2]   Ms. Terry asserts that ASC, as HHC's contracting partner under the Management Agreement, is a "state actor" for purposes of section 1983 liability. In the context of summary judgment only, ASC accepts for the sake of argument its capacity as a state actor.

Ms. Terry's section 1983 claims are based on alleged violations of her father's rights to quality care and treatment at Edgewater Woods under the Federal Nursing Home Reform Act. She does not contend Congress created as part of FNHRA a private right of action, which is why she seeks to vindicate rights under FNHRA through section 1983. Neither the Supreme Court nor the Seventh Circuit has decided whether "patient rights" under FNHRA are the kind of rights actionable under section 1983. The only circuit court to reach the issue, the Third Circuit in *Grammer v. John J. Kane Regional Centers-Glen Hazel,* 570 F.3d 520 (3rd Cir. 2009), *cert. denied,* 130 S.Ct. 1524 (2010), held that violations of a nursing home resident's rights to certain care and treatment under FNHRA are actionable under section 1983. Several district courts have reached the contrary conclusion. *See Hawkins v. County of Bent, Colorado,* 800 F. Supp. 2d 1162 (D. Colo. 2011); *Baum v. Northern Dutchess Hosp.,* 764 F. Supp. 2d. 410 (N.D.N.Y. 2011); *Duncan v. Johnson-Mathers Health Care, Inc.,* 2010 WL 3000718 (E.D. Ky. July 28, 2010). *But see Pantalone ex rel. Pantalone v. County of Fulton,* 2011 WL 1457935 (N.D.N.Y. April 15, 2011) (disagreeing with *Baum* and denying motion to dismiss section 1983 claim based on defendants' alleged violations of patient care rights under FNHRA).

Based on the analysis that follows, this court determines that the FNHRA provisions, the violation of which Ms. Terry alleges led to her father's unnecessary suffering and death, do not create rights actionable under section 1983.

**A. The Analytical Framework**

**1. Overview of the FNHRA Provisions**

FNHRA became law as part of the Omnibus Budget Reconciliation Act of 1987, and it provides for the "oversight and inspection of nursing homes that participate in Medicare and Medicaid programs." *See Grammer v. John J. Kane Regional Centers-Glen Hazel,* 570 F.3d

520, 523 (3rd Cir. 2009). For certification under the Medicare and Medicaid programs, nursing home facilities (referred to as "skilled nursing facilities") must comply with the FNHRA requirements under 42 U.S.C. § 1395i-3 (Medicare) and 42 U.S.C. § 1396r (Medicaid), along with implementing regulations in 42 C.F.R. § 483 *et seq. See Grammer,* 570 F.3d at 523-24. A general overview of FNHRA is helpful to the court's analysis and is given below, organized by subsection, with citations to both the Medicare and corresponding Medicaid provision.[3]

- Subsection (a) (Medicare: § 1395i-3(a); Medicaid: § 1396r(a)) defines skilled nursing facility.

- Subsection (b) (§ 1395i-3(b); § 1396r(b)) sets forth requirements for the facility to maintain or enhance the quality of life of each resident, requires the facility to create, follow, and periodically review a written plan of care for each resident, requires the facility to conduct a comprehensive assessment of each resident's functional capacity promptly upon the resident's admission to the facility and periodically thereafter, and requires the facility to provide medical, psychological, dental, pharmaceutical, dietary, and social services necessary to fulfill the plans of care for its residents.

- Subsection (c) (§ 1395i-3(c); § 1396r(c)) sets forth requirements for the facility to protect and promote "the rights of each resident," including rights to choose an attending physician, to participate in decision-making for one's own care, to privacy and the confidentiality of personal and clinical records, to voice grievances, to visits from family and friends, and to participate in social, religious, and community activities.

- Subsection (d) (§ 1395i-3(d); § 1396r(d)) sets forth requirements for the facility's administration, and "in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident," including the requirement it be licensed under applicable State and local laws.

- Subsection (e) (§ 1395i-3(e); §1396r(e)) sets forth requirements a State must follow, including requirements with respect to the State's training, licensing, and evaluation of nurses aides and the State's qualification of administrators of skilled nursing facilities.

- Subsection (f) (§ 1395i-3(f); § 1396r(f)) describes the federal government's responsibilities to assure that the requirements governing the provision of care in nursing

---

[3] The provisions of Medicare and Medicaid are materially identical for purposes of the court's analysis on summary judgment, although the court notes that the Medicaid provisions impose some different and additional demands than under Medicare.

facilities are enforced and "are adequate to protect the health, safety, welfare, and rights of residents and to promote the effective and efficient use of public moneys."

- Subsection (g) (§ 1395i-3(g); § 1396r(g)) provides for monitoring nursing facilities' compliance with the statute by the State and federal government. A State, pursuant to an agreement with the federal government, is responsible for conducting surveys of nursing facilities within its state regarding the facilities' compliance with the requirements of subsections (b), (c), and (d). Each nursing facility is subject to a "standard survey" without prior notice at least once every 15 months and an "extended survey" if the facility is found to have provided substandard quality of care under the standard survey. Each State also must implement and maintain procedures to monitor a facility's compliance with the requirements of subsections (b), (c), and (d), to investigate complaints of violations, and to provide notices of noncompliance to attending physicians, state licensing authorities, and to the public.

- Subsection (h) (§ 1395i-3(h); § 1396r(h)) provides certain enforcement mechanisms available to the federal government if a facility is noncompliant with the statute's requirements, including imposition of civil monetary penalties, denial of Medicare [or Medicaid] payments, appointment of temporary management to oversee the facility's operations, and termination of the facility's participation in the Medicare [or Medicaid] program. This provision also states: "The remedies provided under this subsection are in addition to those otherwise available under State or Federal law and shall not be construed as limiting such other remedies, including any remedy available to an individual at common law." (§ 1395i-3(h)(5); §1396r(h)(5)).

- Finally, subsection (i) (§ 1395i-3(i); § 1396r(i)) provides that certain information regarding nursing homes must be made available on the Department of Health and Human Services' official website, and subsection (j) (§ 1395i-3(j); § 1396r(j)) provides that when requirements or obligations under the Medicare provisions are identical to those under the Medicaid provisions, fulfillment of one set of provisions is fulfillment of the corresponding provisions under the other program.

### 2. The Supreme Court's *Blessing* and *Gonzaga* Decisions

In *Blessing v. Freestone,* 520 U.S. 329 (1997), the Supreme Court adopted a framework for determining whether a federal statute creates the kind of *rights,* violations of which are actionable under 42 U.S.C. § 1983. Later, in *Gonzaga University v. Doe,* 536 U.S. 273 (2002), the Court expanded and clarified its analysis because some language in *Blessing* had led lower

courts to interpret the *Blessing* framework vis-à-vis various federal statutes more liberally in favor of enforcement under section 1983 than the Court intended.[4]

*Blessing* addressed Title IV-D of the Social Security Act, an interlocking federal-state welfare program under which children may be eligible for certain child support services from the state. Five mothers brought suit against the director of Arizona's Title IV-D program under section 1983. They claimed that due largely to structural defects in the state agency's operation of the Title IV-D program, the agency had not taken adequate steps to obtain child support payments from the fathers of their children, and these "systemic failures violated their federal rights under Title IV-D" and were redressable under section 1983. 520 U.S. at 337.

The Court in *Blessing* emphasized the overarching principle that a section 1983 claim requires "the violation of a federal *right*, not merely a violation of federal law." *Id.* at 340 (emphasis in original). The Court stressed the importance of the plaintiff specifying the exact right she claims a statute affords her (*id.* at 342), and identified three factors for "determining whether a particular statutory provision gives rise to a federal right":

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted rights must be couched in mandatory, rather than precatory, terms.

*Id.* at 340-41 (internal citations omitted).

And even if the statute creates an "individual right," the presumed enforceability of the right under section 1983 is rebuttable because Congress may have expressly in the statute itself

---

[4] This area of the law is relatively young. It was not until 1980, in *Maine v. Thiboutot,* 448 U.S. 1 (1980), that the Supreme Court first recognized that "§ 1983 actions may be brought against state actors to enforce rights created by federal statute as well as by the Constitution." *Gonzaga University,* 536 U.S. at 279.

foreclosed a section 1983 remedy or may have done so impliedly "by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* at 341.

Under this framework, the Court fairly easily disposed of the plaintiffs' section 1983 claim. The *Blessing* plaintiffs' challenge to Arizona's Title IV-D program was not based on any specific provisions of the law, but rather on the state agency's broad-based failure to manage the program in accordance with federal law. The plaintiffs sought an injunction to achieve "substantial compliance . . . throughout all programmatic operations," *id.* at 341-42, referencing the statute's enforcement mechanism allowing the Secretary of the Department of Health and Human Services to impose a monetary penalty on a state that does not "substantially comply" with the statute's requirements. *See id.* at 335. The "substantial compliance" requirement was not aimed at benefitting individual children or creating an individual entitlement to services, but was a yardstick standard that could be met when, for example, the state experienced 90 percent compliance with case opening and closure requirements and 75 percent compliance with "most remaining program requirements." *Id.* at 335. As a result of these provisions, the state agency could be in substantial compliance, yet the very plaintiffs bringing suit could be in the 10 or 25 percent groups for which program requirements were not met. *Id.* at 344-45.[5]

As mentioned above, soon after *Blessing,* the Court again addressed the circumstances under which a federal statute may be construed to give rise to individual rights enforceable via section 1983. In *Gonzaga University v. Doe,* 536 U.S. 273 (2002), a former student of Gonzaga University sued the school for reporting to his would-be employer that the student had been investigated because of allegations of sexual misconduct. He claimed the university had violated

---

[5] The Court left open the possibility, on remand, for the plaintiffs to identify "exactly what rights, considered in their most concrete, specific form" they were asserting, and for the district court to analyze their redressability using the framework the Court adopted. *Id.* at 346.

a nondisclosure provision of the Family Educational Rights and Privacy Act ("FERPA"), which "prohibits federal funding of schools that have a policy or practice of permitting" the release of a student's educational records without consent. *Id.* at 276. The Court noted that numerous state and federal courts were divided on the question whether FERPA can be enforced under section 1983, though they all had relied on the same Supreme Court precedents. It thus sought to resolve any ambiguity in its previous opinions regarding the circumstances under which federal "rights" may be enforced under section 1983.

In addition to refining the analysis under the *Blessing* factors, the Court found it particularly significant that FERPA was enacted by Congress under its spending power and conditioned the receipt of federal funds on certain statutory requirements, including the restriction on disclosure of students' educational records. The Court traced a history of its decisions regarding private enforcement of spending clause legislation, noting its statement in *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1 (1981), that federal spending legislation does not provide a basis for enforcement under section 1983 unless "Congress 'speak[s] with a clear voice,' and manifests an 'unambiguous' intent to confer individual rights." *Gonzaga,* 536 U.S. at 281 (quoting *Pennhurst,* 451 U.S. at 17). Only two cases had fit the mold since *Pennhurst,* each of which involved federal statutes that explicitly conferred specific monetary entitlements on the plaintiffs and had no administrative means for enforcing the requirement. *Id.* at 280-81. More recent decisions had "rejected attempts to infer enforceable rights from Spending Clause statutes." *Id.* at 282.

Turning more specifically to the factors discussed in *Blessing,* the Court in *Gonzaga* eschewed the ease with which lower courts had found that Congress intended a particular statutory provision "to benefit the plaintiff." It is not sufficient that a plaintiff benefits from a

statute or is within the "zone of interest" that a statute is intended to protect. *Id.* at 282-83. Rather, nothing "short of an unambiguously conferred right" will do, *id.* at 283; it is the same inquiry as that undertaken in the direct private right of action context. *Id.* ("our implied right of action cases should guide the determination of whether a statute confers rights enforceable under 1983").[6] The ultimate issue is whether by the "text and structure of a statute," Congress intended to create new individual rights. *Id.* at 287.

Applying these principles, the Court held there was "no question" that FERPA's nondisclosure provisions did not confer enforceable rights. *Id.* at 287. The provisions do not contain "rights-creating" language, they have an "aggregate" focus on the policies and practices of the educational institution instead of the needs of particular persons, and they "serve primarily to direct the Secretary of Education's distribution of public funds." *Id.* at 290.

### B. Application of those Principles to this Case

#### 1. The Statutory "Rights" Asserted by Ms. Terry

Ms. Terry's brief does not identify the specific FNHRA provisions upon which her claims are based. To be sure, she quotes many FNHRA provisions (and corresponding regulations) in her brief, but she does not identify any particular ones as the focus of her claims. Her quotations serve another purpose—to support her argument that FNHRA in general focuses on the needs of individual nursing home residents.[7] The defendants' opening brief states that

---

[6] In the private right of action context, a second question—not pertinent here—also must be answered: does the statute itself "manifest an intent 'to create not just a private *right* but also a private *remedy.*'" *Id.* at 284 (emphasis in *Gonzaga*) (quoting *Alexander v. Sandoval,* 532 U.S. 275, 286 (2001)).

[7] For example, on pages 9 and 10 of her response brief (*see* Dkt. 75 at pp. 9-10), Ms. Terry cites to language from subparagraphs (b), (c), and (d) of the FNHRA provisions under Medicaid to support her argument that FNHRA's focus is on individuals and not the nursing facility. She argues that although the nursing facility is the subject of the sentences in the statutes she quotes,

Ms. Terry identified the following specific provisions in her answers to interrogatories (Dkt. 66-5) as those she contends create the rights violated:  42 U.S.C. § 1396r(b)(1)(A) and (b) (2); 42 U.S.C. § 1396r(b)(4)(A)(i) and 4(A)(iv); 42 U.S.C. § 1396r(c)(1)(A)(v)(I); and 42 U.S.C. § 1396r(d)(1)(A) and (d)(4). (*See* defendants' opening brief, Dkt. 65, at p. 10).  Ms. Terry did not object to, or comment on, the defendants' elucidation of her claim.  As the defendants point out, these statutory provisions are under the Medicaid Act and Mr. McMillen was a Medicare recipient, not a Medicaid beneficiary.  But the Medicare Act has substantially identical provisions, and the court will review the Medicare provisions corresponding to the provisions Ms. Terry identified in discovery.

The Medicare FNHRA provisions Ms. Terry seeks to enforce through her section 1983 claims all concern quality of care.  They read:

> Section 1395i-3(b)(1)(A): A skilled nursing facility must care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident.

> Section 1395i-3(b)(2):  A skilled nursing facility must provide services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, in accordance with a written plan of care which—
> (A)    describes the medical, nursing, and psychosocial needs of the residents and how such needs will be met;
> (B)     is initially prepared, with the participation to the extent practicable of the resident or the resident's family or legal representative, by a team which includes the resident's attending physician and a registered professional nurse with responsibility for the resident; and

---

the individual resident is the object, and "[a]s they are the object of the sentence, so are residents the object of the statute itself."  (Dkt. 75 at p. 9).  The court does not understand Ms. Terry to contend that the quoted language on these pages necessarily constitute the subject of her claims. For example, among the statutory citations are ones requiring periodic assessments of a resident's functional capacity, 42 U.S.C. §§ 1396r(b)(3)(A) and (b)(3)(C), but her answers to interrogatories do not identify these provisions as ones underlying her claims.

(C)     is periodically reviewed and revised by such team after each assessment under paragraph (3).

Section 1395i-3(b)(4)(A)(i) and (iv):  To the extent needed to fulfill all plans of care described in paragraph (2), a skilled nursing facility must provide, directly or under arrangements (or, with respect to dental services, under agreement) with others for the provision of—

(i)     nursing services and specialized rehabilitative services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident; . . .

(iv)    dietary services that assure that the meals meet the daily nutritional and special dietary needs of each resident.

Section 1395i-3(c)(1)(A)(v)(I):  A skilled nursing facility must protect and promote the rights of each resident, including each of the following rights:  (v)The right (I) to reside and receive services with reasonable accommodation of individual needs and preferences, except where the health or safety of the individual or other residents would be endangered.

Section 1395i-3(d)(1)(A):  A skilled nursing facility must be administered in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident (consistent with requirements established under subsection (f)(5) of this section).

Section 1395i-3(d)(4):  A skilled nursing facility must operate and provide services in compliance with all applicable Federal, State, and local laws and regulations (including the requirements of section 1320a-3 of this title) and with accepted professional standards and principles which apply to professionals providing services in such a facility.

Thus, as gleaned from the specific statutes that form the basis of Ms. Terry's claims, she

seeks a damages remedy under section 1983 for the defendants' alleged failures to provide care

to her father and to conduct the operations of Edgewater Woods in a manner that attained or

maintained for him the "highest practicable physical, mental, and psychosocial well-being," and

in compliance with "accepted professional standards and principles which apply to professional

providing services" in a skilled nursing facility.[8]  The only statutory section underlying  Ms.

---

[8]     Sections 1395i-3(b)(2), 1395i-3(b)(4)(A)(i), 1395i-3(d)(1)(A) all reference the standard "to attain or maintain the highest practicable physical, mental, and psychosocial well-being of

Terry's claims that uses the term "rights" is section 1395i-3(c)(1)(A)(v)(I), which allows a resident the "right to reside and receive services with reasonable accommodation of individual needs and preferences, except where the health or safety of the individual or other residents would be endangered."

### 2. Application of the Supreme Court's Holdings to these Statutes

In essence, then, Ms. Terry contends that FNHRA is enforceable under section 1983, creates a federal medical malpractice regime applicable to state-actor skilled nursing facilities and the individual health care providers they employ, and establishes a standard of care triggering financial liability for the failure to afford to an individual the "highest practicable physical, mental, and psychosocial well-being." This standard is markedly different from a traditional common law negligence standard.

The teachings of the Supreme Court in *Blessing* and *Gonzaga*, as well as other authority, convince the court that Congress did not create in FNHRA patient "quality of care" rights enforceable by way of section 1983. In *Blessing* and *Gonzaga,* the Court readily determined that Congress did not intend by the subject statutes to create new individual rights. In *Blessing,* the statutory provisions at issue were directed to the aggregate child-welfare services provided by the state agency, and in *Gonzaga,* the FERPA provision at issue was phrased in terms of the Secretary of Education's funding obligations. *Gonzaga* contrasted these two statutory schemes with those that instead have an "*unmistakable focus* on the benefited class" of individuals and were found to create individual rights. 536 U.S at 284 (emphasis in original). As examples of the latter, the Court pointed to Title VI of the Civil Rights Act of 1964 and Title IX of the

---

each resident," and section 1395i-3(b)(1)(A)—a general statement that the facility must care for its residents in a manner promoting quality of life—contains nothing that augments that standard. Section 1395i-3(d)(4) is the provision that services comply with accepted professional standards.

Education Amendments of 1972, which include language that "No *person* in the United States *shall* . . . be subjected to discrimination. . . ." *See Gonzaga,* 536 U.S. at 284 and n. 3 (emphasis in original).

The FNHRA provisions, though somewhat different from those the Supreme Court addressed in *Blessing* and *Gonzaga*, still lack the features necessary to establish an individually enforceable right. As the defendants point out, FNHRA is couched in terms of what the state must require of a skilled nursing facility for its certification for participation in the federal Medicaid and Medicare programs. The subsections emphasize what a "skilled nursing facility must" do and the state's duties relating to the requirements imposed on the nursing facility.[9] To be sure, the requirements imposed on a nursing facility as a condition to participation in the Medicaid and Medicare programs are designed to benefit the individual residents of nursing homes. This court also acknowledges that an impetus for the legislation was that Congress was "deeply troubled that the Federal Government . . . continue[d] to pay nursing facilities for providing poor quality care to vulnerable elderly and disabled beneficiaries." *See Grammer v. John J. Kane Regional Centers-Glen Hazel,* 570 F.3d 520, 523 (3rd Cir. 2009) (quoting H.R. Rep. No. 100-390 at 471 (1987), reprinted in U.S.C.C.A.N. 2313-1, 2313-272)). But FNHRA's statutory language stops far short of articulating the grant of a new right in an individual person evidenced by language like "no person shall be subjected to discrimination."

---

[9]     Subsection (b) are the facility's "requirements relating to provision of services"; (c) are the facility's "requirements relating to residents' rights"; (d) are the facility's "requirements relating to administration and other matters"; (e) are the State's "requirements relating to skilled nursing facility requirements"; (f) are the "Responsibilities of the Secretary [of the Department of Health and Human Services] relating to skilled nursing facility requirements; (g) provisions describe the "survey and certification process"; (h) provisions describe the "enforcement process"; and (i) provisions relate to website information.

The Third Circuit, in *Grammer,* reached a different conclusion (over a strong and, in this court's view, more persuasive dissent), but the Third Circuit was constrained by its own precedent in reaching its decision. That precedent—*Sabree ex rel. Sabree v. Richman,* 367 F.3d 180 (3ᵈ Cir. 2004)—was "the foundation for [the court's] holding" in *Grammer.* 570 F.3d at 526. In *Sabree,* the Third Circuit had ruled that a provision of a Medicaid statute requiring states to provide medical services with "reasonable promptness" to developmentally disabled persons "unambiguously conferred private rights upon them." *See Grammer,* 570 F.3d at 526 (describing *Sabree*). In stark contrast, the Seventh Circuit, also interpreting a Medicaid provision imposing requirements on the states, found the statute could not be interpreted to create individual rights. *Bruggeman ex rel. Bruggeman v. Blagojevich,* 324 F.3d 906 (7ᵗʰ Cir. 2003). The statute in *Bruggeman* required the state to provide "care and services . . . consistent with simplicity of administration and the best interests of the recipients." The Seventh Circuit ruled:

> [T]he 'best interests' provision, 42 U.S.C. 1396(a)(19), is insufficiently definite to be justiciable, and in addition cannot be interpreted to create a private right of action, given the Supreme Court's hostility, most recently and emphatically expressed in *Gonzaga University v. Doe,* 536 U.S. 273, 122 S. Ct. 2268, 2273-75, 153 L.Ed.2d 309 (2002), to implying such rights in spending statutes.

324 F.3d at 912. In light of *Bruggeman,* this court concludes that the *Grammer* analysis would not prevail in the Seventh Circuit.

Like the dissenting judge in *Grammer,* who criticized the majority as not having been true to the dictates of *Gonzaga,* this court finds that Ms. Terry's arguments unsuccessfully grapple with *Gonzaga* and its clear direction to lower courts that Congress must have "unambiguously" by both the text and structure of the law intended to create new individual rights. 536 U.S. at 286-87. Though Ms. Terry can point out references in the statute and regulations to *each* resident to whom the nursing facility *must* provide something, the language

always appears within the context of what the *state* must require of a nursing facility to participate in a federal spending program. *See Duncan v. Johnson-Mathers Health Care, Inc.,* 2010 WL 3000718 at *8 (E.D. Ky. 2010) ("While the FNHRA clearly speaks of the rights of nursing home residents, the focus of the statute is on setting forth requirements that nursing homes must follow to maintain their certifications and eligibility for federal funding.").

For Spending Clause legislation—which Ms. Terry concedes describes FNHRA—the Supreme Court noted that the "typical remedy for state non-compliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." 536 U.S. at 280. The Court said that "federal funding provisions provide no basis for private enforcement by § 1983" unless Congress has spoken with a clear voice otherwise. *Id.* FNHRA contains the "typical" remedy. It provides for systematic monitoring of a nursing facility's compliance with the very "quality of care" standards at issue in this case, and for federal enforcement mechanisms against the facility that include civil monetary penalties, denial of Medicare or Medicaid payments,[10] and even termination from the Medicare and Medicaid programs altogether. 42 U.S.C. § 1395i-3(g), (h) [Medicare], 42 U.S.C. § 1396r(g), (h) [Medicaid].

The court is also mindful—again, as emphasized in *Gonzaga*—that the only cases in which the Court has found spending legislation to give rise to enforceable rights are laws that conferred "specific monetary" entitlements on the plaintiff and provided no administrative means to enforce the requirement. 536 U.S. at 280-81. The Seventh Circuit too has warned against interpreting spending statutes to give rise to enforceable rights. *Bruggeman,* 324 F.3d at 911

---

[10] When a facility is found in "substantial compliance" with the subsection (b), (c), and (d) requirements, a "finding to deny payment . . . shall terminate." 42 U.S.C. § 1395i-3(h)(3); 1396r(h)(4). This "substantial compliance" standard, as in *Blessing,* is suggestive of the aggregate focus of the statute on the nursing facility.

(finding that a "best interests" provision in the Medicaid statute was "insufficiently definite to be justiciable, and in addition cannot be interpreted to create a private right of action, given the Supreme Court's hostility, most recently and emphatically emphasized in *Gonzaga*, to implying such rights in spending statutes").

The FNHRA provisions here do not present the features of the spending statutes that the Supreme Court has found to give rise to individual rights. The quality of care standards Ms. Terry points to are not specific, but in fact express a generalized standard—attainment of "highest practicable well-being."[11] And the statute requires the state to implement and maintain procedures for receiving and investigating complaints that a facility violated the requirements of subsections (b), (c), and (d)—statutory requirements Ms. Terry raises here. 42 U.S.C. § 1395i-3(g)(4) [Medicare]; § 1396r(g)(4) [Medicaid]. Indeed, the compliance monitoring and enforcement provisions of the statute are lengthy and detailed. 42 U.S.C. § 1395i-3(g); § 1396r(g). In addition to individual complaint investigation, nursing facilities are subject to comprehensive, surprise,[12] "standard" surveys of their compliance with quality of care and residents' rights requirements at least every 15 months, "extended" surveys if found under a standard survey to have provided "substandard quality of care," and additional surveys if the Secretary "has reason to question the compliance of a skilled nursing facility with any of the requirements of subsections (b), (c), and (d)." The enforcement provisions in subsection (g) are as wide-ranging and detailed as the compliance provisions.

---

[11]     The phraseology has the hallmarks of the "best interests" phrase in *Bruggeman* that the Seventh Circuit called "insufficiently definite to be justiciable." 324 F.3d at 911.

[12]     The survey is to be conducted without prior notice to the facility and any person who notifies the facility of the time or date a survey is scheduled is subject to civil money penalty. 42 U.S.C. § 1395i-3(g)(2)(A)(i).

Congress also carefully expressed its intent not to step on individual rights arising under state law: "The remedies provided under this subsection are in addition to those otherwise available under State or Federal law and shall not be construed as limiting such other remedies, *including any remedy available to an individual at common law.*" § 1395i-3(h)(5); § 1396r(h)(8) (emphasis added). This language implicates the concern the Supreme Court expressed in *Gonzaga* with the "usual constitutional balance between the States and the Federal Government." 536 U.S. at 286. The need for unambiguous manifestation of Congress's intent to create new individual federal rights guards against upsetting the usual balance between the States and the Federal Government. *Id.* (quoting *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 242 (1985): "[[I]f Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'") This factor also weighs against recognition of an individual federal right enforceable under section 1983.

The Court found in *Gonzaga* that the case well illustrated that point, because a conclusion that FERPA's nondisclosure provisions conferred individual rights would mean that "millions of school students from kindergarten through graduate school" would have a federal cause of action in an area with a "tradition of deference to state and local school officials." *Id.* at 286 n.5. Medical malpractice is also an area of traditional deference to state law. Upsetting the balance between the federal and state governments in the medical malpractice realm would have particular significance in Indiana because the Indiana legislature adopted in 1975 a comprehensive statutory scheme for the adjudication of complaints of medical malpractice. *See* Ind. Code art. 34-18. For example, before a plaintiff can even file a complaint in court, a proposed complaint of medical malpractice must first undergo evaluation by a panel of medical

experts to obtain the panel's opinion whether the health care provider met the applicable standard of care.  Ind. Code § 34-18-8-4; *Kho v. Pennington,* 875 N.E.2d 208, 209 n.1 (Ind. 2007).  The Indiana Act also caps the plaintiff's recoverable damages.  For an act of malpractice occurring after June 30, 1999—if a plaintiff chooses to sue after the panel reaches its decision—a plaintiff can recover in a lawsuit no more than $1,250,000; the health care provider (or the insurer, to be more accurate) is responsible for paying only up to $250,000 of the damages, and any remaining amount up to the cap is paid through a pooled Patient's Compensation Fund.  Ind. Code § 34-18-14-3.  The Patient's Compensation Fund is funded through annual surcharges levied on all health care providers in Indiana.  Ind. Code ch. 34-18-6.

This statutory scheme in Indiana has undergone extensive judicial scrutiny; its constitutionality has been challenged but upheld.  *Johnson v. St. Vincent Hospital, Inc.,* 404 N.E.2d 585 (Ind. 1980), *overruled in part on statute of limitations issue by In re Stephens,* 867 N.E.2d 148, 156 (Ind. 2007), provides a comprehensive explication of the statutory scheme and its passage by the Indiana legislature.  The Indiana Supreme Court noted in *Johnson* that, in the Indiana legislature's view, this statutory scheme is in the best interests for the welfare of the citizens of Indiana.  The Court observed, for example, that the Indiana legislature believed that without capping damages and imposing the other barriers in medical malpractice cases, the availability of quality health care services to Indiana citizens was threatened.  *See Johnson,* 404 N.E.2d at 387:  "The Legislature was undoubtedly moved because of its appraisal that the services of health care providers were being threatened and curtailed contrary to the health interests of the community because of the high cost and unavailability of liability insurance."  Whether the Indiana legislature's judgments in this regard were accurate is, of course, not the issue here.  The point germane to the issue at hand is that the Indiana legislature has clearly and

comprehensively undertaken to govern the procedures and remedies for claims of medical malpractice. The recognition of rights under FNHRA enforceable by individuals under section 1983 would result in procedures and a substantive standard markedly different from those established by Indiana law, thus altering the "usual constitutional balance between the States and the Federal Government." This fact underscores the importance of the requirement that the language of FNHRA express a clear and unmistakable intent by Congress to create new individual "quality of care" rights. It does not.

In sum, the court finds that the quality of care provisions under FNHRA relied on by Ms. Terry do not create new individual rights. Her claims under section 1983 therefore fail as a matter of law.

## II.     It is not necessary to decide the *Monell* issue.

The parties' summary judgment briefing also addresses whether, in the event the court decides that FNHRA creates rights enforceable under section 1983, Ms. Terry has shown a genuine issue for trial that her injury was caused by an "official custom or policy," as required by *Monell v. Department of Social Services,* 436 U.S. 658 (1978). Ms. Terry points to the Management Agreement between HHC and ASC as the "foundation" of the official policy and relies on expert opinion to support this aspect of her claim. In short, she contends that in entering into the Agreement with ASC, HHC consciously disregarded a high risk that ASC would violate the FNHRA protections, and that those violations caused her father's injuries and death and the damages she seeks to recover in this case. The defendants contend that the expert opinion is deficient under *Daubert* principles and Rule 56(c) and should be disregarded by the court on those grounds.

The court need not and will not decide this issue in light of its determination that the FNHRA provisions at issue in this case are not "rights" enforceable under section 1983.

## III.    Ms. Terry's state law claims must be dismissed.

The court now turns to the state law claims for medical malpractice set forth in Counts III and IV of the amended complaint.  (Dkt. 44).  Ms. Terry alleges that the defendants' care and treatment of Mr. McMillen fell below a standard of care they owed to him, causing injury and damages.  The defendants ask the court—assuming a ruling in their favor on the section 1983 claims—either to relinquish supplemental jurisdiction over the claims the court has exercised under 28 U.S.C. § 1367(c)(3) or to dismiss the claims without prejudice because Ms. Terry did not comply with the aforementioned requirements under Indiana's Medical Malpractice Act, Ind. Code art. 34-18.  Because, as shown below, settled law makes it clear that the requirements of Indiana's Medical Malpractice Act preclude Ms. Terry from proceeding with her state law claims at this time, the court will not relinquish its supplemental jurisdiction and refrain from deciding this issue.  It would be highly inefficient to leave that issue for another court at another time when its resolution is so clear.

Ms. Terry does not contest that HHC and ASC are "qualified providers" within the meaning of the Indiana Medical Malpractice Act (defined at Ind. Code § 34-18-2-24.5) or that her state law claims for substandard health care are thus within the Act.[13]  Under the Act, two conditions must be satisfied before a court may exercise jurisdiction to adjudicate a malpractice claim.  The plaintiff must first file a proposed complaint with the Indiana Department of

---

[13]    The Act applies to claims in tort or contract based on health care or professional services provided, or that should have been provided, by a health care provider to a patient.  Ind. Code § 34-18-2-18.  "Health care" is defined broadly as "an act or treatment performed or furnished, or that should have been performed or furnished, by a health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement."  Ind. Code § 34-18-2-13.

Insurance and a medical review panel must be formed and issue its opinion on whether the providers' health care did or did not meet the applicable standard of care. Ind. Code § 34-18-8-4.[14] *Kho v. Pennington,* 875 N.E.2d 208, 209 n.1 (Ind. 2007); *H.D. v. BHC Meadows Hospital, Inc.,* 884 N.E.2d 849, 853 (Ind. Ct. App. 2008).

In *Hines v. Elkhart General Hospital,* 603 F.2d 646 (7th Cir. 1979), the Seventh Circuit found that these "salient features" of the Indiana Act apply in an action in federal court, and it affirmed the district court's dismissal of the claims of a plaintiff who had not complied with the Act's requirements to first file a proposed complaint for consideration by a medical review panel and obtain the panel's opinion. *Id.* at 647 (finding the argument that Indiana Medical Malpractice Act was inapplicable to diversity cases in federal court "totally devoid of merit").

Ms. Terry argues that these statutory prerequisites to filing a complaint in court apply only in diversity cases and do not apply to her malpractice claims because this court is exercising supplemental jurisdiction over them under 28 U.S.C. § 1367 (based on assertion of her section 1983 claims). Ms. Terry cites no authority for this remarkable view. The source of this court's jurisdiction to adjudicate state law claims does not work a change in the underlying governing state law. The bedrock principle, going back to *Erie R. Co. v. Tompkins,* 304 U.S. 64 (1938), is that federal courts deciding state law claims apply the substantive law of the state. *Id.* at 78. The Seventh Circuit has recognized that this principle is not limited to diversity cases. *Houben v. Telular Corp.,* 309 F.3d 1028, 1032 (7th Cir. 2002) ("While *Erie* questions arise most frequently in diversity cases, the Supreme Court has made clear that the doctrine applies equally to state law claims . . . that are brought to the federal courts through supplemental jurisdiction under 28 U.S.C. § 1367."). Under Indiana's Medical Malpractice Act, a court may not adjudicate the

---

[14]     Small dollar claims ($15,000 or less) can bypass the medical review panel. Ind. Code § 34-18-8-6. This exception does not apply here.

merits of a medical malpractice claim against a qualified provider before the plaintiff has filed a proposed complaint with the Indiana Department of Insurance and the medical review panel has issued its opinion. *Kho v. Pennington,* 875 N.E.2d at 209, 211; *H.D. v. BHC Meadows Hospital,* 884 N.E.2d at 853.

In these circumstances, the malpractice claims must be and are dismissed. *Hubbard v. Columbia Women's Hospital,* 807 N.E.2d 45, 52 (Ind. Ct. App. 2004); *Estate of Perry ex rel. Perry v. Boone County Sheriff,* 2008 WL 694696 at *16 (S.D. Ind. March 12, 2008). This dismissal is without prejudice but is a final adjudication in this court.[15]

## **Conclusion**

The court GRANTS summary judgment in favor of defendants The Health and Hospital Corporation of Marion County and American Senior Communities, LLC on Counts I and II of Ms. Terry's amended complaint. The court DISMISSES WITHOUT PREJUDICE Counts III and IV of the amended complaint. Final judgment in favor of the defendants will be entered by separate order.

So ORDERED.

Date:   03/29/2012

Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

---

[15]     The court's ruling is not a judgment on the merits of Ms. Terry's state law malpractice claims.

Distribution:

Bryce H. Bennett, Jr.
RILEY BENNETT & EGLOFF LLP
bbennett@rbelaw.com

Harry Kennard Bennett
ken@hkbennettlaw.com

Laura K. Binford
RILEY BENNETT & EGLOFF LLP
lbinford@rbelaw.com